UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>v.<br><br>TOMER FEINGOLD and DOV MALNIK,<br><br>    Defendants,<br><br>and<br><br>ADAMAS HEALTHCARE FUND, AMISERVICE DEVELOPMENT LIMITED, AMPLE VANTAGE TRADING LIMITED, BRAVO BUSINESS LIMITED, KURAY INVESTMENTS LIMITED, MIGNON GROUP LIMITED, UPBEAT WORLDWIDE INVESTMENTS LIMITED,<br><br>    Relief Defendants. | Civil Action No.<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("the Commission") alleges as follows against Defendants Tomer Feingold ("Feingold") and Dov Malnik ("Malnik"), along with Relief Defendants Adamas Healthcare Fund ("Adamas"), Amiservice Development Limited ("Amiservice"), Ample Vantage Trading Limited ("Ample Vantage"), Bravo Business Limited ("Bravo Business"), Kuray Investments Limited ("Kuray Investments"), Mignon Group Limited ("Mignon Group"), and Upbeat Worldwide Investments Limited ("Upbeat Worldwide"):

### SUMMARY OF THE ACTION

1.      From in or about 2013 through in or about at least 2015, Feingold and Malnik participated in an international insider trading scheme that netted them millions in illicit profits.

The scheme involved tips that originated from Benjamin Taylor ("Taylor") and Darina Windsor ("Windsor"), two investment bankers working in London (the "Taylor-Windsor Tipping Scheme").[1]

2. In the Taylor-Windsor Tipping Scheme, Taylor directly or indirectly provided to a trader based in Switzerland ("Trader A") material nonpublic information about impending corporate transactions advised by both Taylor's employer, Investment Bank 1, and his girlfriend Windsor's employer, Investment Bank 2. Trader A used this information to place illegal trades and, in turn, tipped others, including Feingold and Malnik, who also placed illegal trades.

3. Using the information that Trader A obtained from Taylor and Windsor, Feingold and Malnik generated more than $4 million in illicit profits trading the securities of at least seven different companies, both through their individual trading accounts and through brokerage accounts in the names of the Relief Defendants that were controlled at all times relevant to this Complaint by Feingold and/or Malnik.

4. In exchange for Trader A sharing tips of inside information, Feingold and Malnik provided Trader A with a share of the trading profits that they made from trading on inside information in the Taylor-Windsor Tipping Scheme. Feingold and Malnik understood from Trader A that the material nonpublic information for which they were paying Trader A emanated from insiders at investment banks.

5. By knowingly or recklessly engaging in the conduct described in this Complaint, Defendants violated, and unless restrained and enjoined will continue to violate, Sections 10(b) and 14(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b),

---

[1] The Commission has filed a complaint against Taylor and Windsor in the Southern District of New York, alleging that the defendants' conduct, described above as the "Taylor-Windsor Tipping Scheme," violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Section 14(e) of the Exchange Act and Rule 14e-3 thereunder. *See* Complaint, *SEC v. Taylor, Windsor, and El-Khouri*, 19-cv-09744 (LAP) (filed October 22, 2019) (ECF No. 3).

78n(e)] and Rules 10b-5 and 14e-3 thereunder [17 C.F.R. §§ 240.10b-5, 240.14e-3].

## NATURE OF PROCEEDING AND RELIEF SOUGHT

6. The Commission brings this action under Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)]. The Commission seeks permanent injunctions against the Defendants, to enjoin them from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint; disgorgement by the Defendants and the Relief Defendants of profits realized within the five-year statute of limitations from the unlawful insider trading set forth herein, along with prejudgment interest; and civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1], and for such other relief as the Court may deem just and appropriate.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this action under Sections 21(d), 21(e), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa]. Certain of the acts, practices, transactions, and courses of business constituting the violations made use of a means or instrumentality of interstate commerce, or of the mails, and/or of the facilities of national securities exchanges.

8. Venue in this District is proper under Section 27 of the Exchange Act [15 U.S.C. § 78aa], because certain of the acts, practices, transactions, and courses of business constituting the violations alleged in this Complaint occurred in the Southern District of New York.

## THE DEFENDANTS

9. **Feingold**, age 40, is an Israeli citizen who resides in Geneva, Switzerland. Feingold attended college in the United States in or about 2003.

10. **Malnik**, age 42, is an Israeli citizen who resides in Geneva, Switzerland. Malnik previously resided in New York, New York, and now works for a hedge fund in Geneva. Malnik

received his undergraduate degree in finance and international business in 2002 from a university in the United States.

11. In or about 2015, Malnik and Feingold filed a breach of contract case in New York state court that was later removed to the Southern District of New York. *See* Notice of Removal, *Malnik and Feingold v. Muddy Waters, LLC, et. al.*, 15-cv-00754 (LTS) (S.D.N.Y.) (filed Feb. 2, 2015).

12. In their lawsuit, Malnik and Feingold alleged that the defendants breached oral promises made, *inter alia*, during "a series of meetings" with Malnik and Feingold held in connection with a research firm that Malnik and Feingold allegedly co-founded, "including in New York, New York[.]" *See* Summons, *Malnik and Feingold v. Muddy Waters, LLC, et. al.*, Index No. 652948/2014, New York Sup. Ct., (dated Sept. 26, 2014).

## OTHER RELEVANT INDIVIDUALS

13. **Taylor**, age 36, resides in France. Between approximately February 2010 and May 2014, Taylor worked in the London office of Investment Bank 1, whose global headquarters are in New York City. Taylor worked for other investment banks before and after his employment with Investment Bank 1.

14. **Windsor**, age 32, is a native of Thailand who resided in London from approximately 2010 to 2016 and currently resides in Thailand. Windsor worked at Investment Bank 1, where she met Taylor, from July 2010 through September 2012. From September 2012 through January 2016, Windsor worked as an investment banker at the London office of Investment Bank 2, whose global headquarters are in New York City.

15. **Trader A,** age 49, is a Switzerland-based securities trader who obtained material non-public information misappropriated by Taylor and Windsor, and, as described in greater

detail herein, traded on that inside information and tipped it to Feingold and Malnik, among others.

## RELIEF DEFENDANTS

16. **Adamas Healthcare Fund** is a hedge fund incorporated in the Cayman Islands, with offices in Geneva, Switzerland. The Adamas Healthcare Fund purportedly focuses its investments in publicly traded biotechnology and pharmaceutical companies. At all times relevant to this Complaint, the Adamas Healthcare Fund was controlled by Malnik and Feingold.

17. **Amiservice Development Limited** is incorporated in the British Virgin Islands and headquartered in Hong Kong. At all times relevant to this Complaint, Amiservice Development Limited and all brokerage accounts held in its name were controlled by Malnik.

18. **Ample Vantage Trading Limited** is incorporated in the British Virgin Islands and headquartered in Hong Kong. At all times relevant to this Complaint, Ample Vantage Trading Limited and all brokerage accounts held in its name were controlled by Malnik.

19. **Bravo Business Limited** is incorporated in the British Virgin Islands and headquartered in Hong Kong. At all times relevant to this Complaint, Bravo Business Limited and all brokerage accounts held in its name were controlled by Feingold.

20. **Kuray Investments Limited** is incorporated in the British Virgin Islands and headquartered in Geneva, Switzerland. At all times relevant to this Complaint, Kuray Investments Limited and all brokerage accounts held in its name were controlled by Malnik.

21. **Mignon Group Limited** is incorporated in the British Virgin Islands and headquartered in Cyprus. At all times relevant to this Complaint, Mignon Group Limited and all brokerage accounts held in its name were controlled by Malnik.

22. **Upbeat Worldwide Investments Limited** is incorporated in the British Virgin Islands and headquartered in Hong Kong. At all times relevant to this Complaint, Upbeat

Worldwide Investments Limited and all brokerage accounts held in its name were controlled by Feingold.

## TYPES OF SECURITIES TRADED

23. In connection with the Taylor-Windsor Tipping Scheme, Trader A, Feingold, and Malnik established "long" positions in companies that were targeted for acquisition by purchasing shares of common stock, options, and contracts-for-difference.

24. A contract-for-difference ("CFD") is an agreement between two parties to exchange the difference in value of an underlying stock between the time the contract is opened and the time at which it is closed. If the share price of the underlying stock increases, the seller pays the difference to the buyer; however, if the share price declines, the buyer must pay the seller. A CFD thus mirrors the movement and pricing of its underlying stock on a dollar-for-dollar basis, such that any fluctuation in the market price of the underlying security is reflected in the unrealized gain or loss of the CFD position. The purchase and sale prices of CFDs are identical to the prices quoted for the shares on the public exchange on which the underlying common stock is listed.

25. An equity CFD purchaser typically initiates a long position in the same manner in which he or she would purchase common stock, by submitting an order with a CFD provider to buy a certain number of CFDs in a particular stock. The provider ordinarily purchases the corresponding number of the underlying shares to hedge its position and writes the CFDs to the client at the same price.

26. As set forth below, Trader A, Feingold, and Malnik purchased CFDs in U.S. companies through foreign brokerage firms. These firms hedged their exposure by purchasing shares of the underlying companies on U.S. exchanges through domestic brokerage firms, or

purchasing CFDs through other foreign brokerage firms, which in turn purchased the shares of the underlying companies on U.S. exchanges through domestic brokerage firms.

## FACTUAL ALLEGATIONS

### A. Feingold's and Malnik's Relationship with Trader A

27. Feingold and Trader A have known each other since at least the summer of 2013, when they met while vacationing in Greece. After discussing the prospect of working together to trade on inside information, Feingold suggested that Trader A meet his business partner, Malnik, who might also want to participate in the scheme.

28. Shortly thereafter, upon returning to Switzerland from Greece, Trader A contacted Malnik and the two discussed the insider trading scheme at a meeting in Geneva. At that time, Trader A and Malnik agreed only to communicate through "safe" methods that would be difficult to detect—specifically, by talking in person, by using pre-paid "burner" telephones, or through secure application-based communications on mobile phones.

29. As alleged in more detail below, beginning in at least the summer of 2013, Trader A began to provide illegal insider trading tips to Feingold and Malnik in exchange for a share of the profits that Feingold and Malnik generated trading on these tips.

30. Feingold and Malnik paid Trader A for the illicit inside information in a variety of ways. At an early meeting in 2013, Malnik met Trader A in Geneva, and provided Trader A with a bag filled with cash. On another occasion in or about 2014, Malnik purchased a luxury watch from a watch dealer in Los Angeles, California, and he later gave it to Trader A in exchange for the insider tips.

31. Feingold and Malnik also paid Trader A by transferring money from entities they controlled into a Swiss bank account controlled by an associate of Trader A ("Trader A Associate"), in order to conceal the purpose and real parties involved in the payments. The

Trader A Associate in turn transferred the funds to an account controlled by Trader A or otherwise funneled the money to or for the benefit of Trader A. From in or about 2013 through in or about at least 2015, entities controlled by Feingold and Malnik transferred millions of dollars to the Swiss bank account controlled by the Trader A Associate, who provided Feingold and Malnik with fake invoices, falsely stating that the payments were for unspecified "consulting services."

### B. Overview of the Taylor-Windsor Tipping Scheme

32. From in or about 2013 through in or about at least 2015, Feingold and Malnik participated in the Taylor-Windsor Tipping Scheme, wherein Taylor and Windsor provided Trader A with material nonpublic information about publicly traded companies, and Trader A tipped Feingold and Malnik with that information.

33. Trader A received material non-public information directly or indirectly from Taylor and/or Windsor, who misappropriated the information from their employers, Investment Banks 1 and 2. Trader A, Feingold, and Malnik used the material non-public information from Taylor and/or Windsor to execute profitable trades in advance of market-moving corporate news.

34. In connection with their employment at the respective banks, both Taylor and Windsor were subject to specific policies and procedures aimed at ensuring the confidentiality of nonpublic information and prohibiting the misuse of such information for personal gain through securities trading or other means. Taylor and Windsor repeatedly violated these policies.

35. Taylor and Windsor participated in this insider trading scheme because they expected to receive a share of the trading profits. Indeed, in February or March 2013, shortly after the scheme began, Windsor created an excel file, entitled Popsy (her pet name for Taylor), that detailed how the profit would be split from an expected investment:

8

|        | USD       |     | GBP    |     |
|--------|-----------|-----|--------|-----|
| Amount | 2,000,000 |     |        |     |
| %      | 20.0%     |     |        |     |
| Profit | 400,000   |     |        |     |
| Swiss  | 200,000   | 50% |        |     |
| Mine   | 100,000   | 50% | 66,667 | 1.5 |
|        |           | 100 |        | 50  |
| Note   | 1000      |     | 1,333  |     |

36. Among other things, the spreadsheet calculates the amount of specific US and British currency, in denominations of hundred dollar bills and 50 pound notes respectively, required to make the requisite cash payment of Windsor's share of the trading proceeds.

37. Taylor and Windsor in fact received substantial cash payments and other benefits (such as watches, clothing, other luxury items, and travel) in exchange for directly or indirectly providing the insider trading tips to Trader A.

38. Feingold and Malnik knew that Trader A was paying insiders to obtain the material non-public information that he tipped to Feingold and Malnik to trade profitably in U.S. securities.

39. Based on the material nonpublic information that Taylor and Windsor directly or indirectly provided, Trader A, Feingold, and Malnik generated substantial profits purchasing the securities of U.S.-traded companies that had been targeted for acquisition in advance of such inside information being disclosed to the public.

### C. Feingold, Malnik, and Trader A Trade on Tips of Inside Information About Deals Advised by Investment Bank 2

40. On multiple occasions from in or about 2013 through in or about at least 2015, Taylor directly or indirectly tipped to Trader A material nonpublic information that he obtained from Windsor, who misappropriated the information from Investment Bank 2. Trader A then tipped that material nonpublic information to Feingold and Malnik.

9

### Pharmacyclics

41. For example, with Windsor's knowledge and consent, Taylor directly or indirectly tipped material nonpublic information misappropriated from Investment Bank 2 to Trader A, who further tipped Feingold and Malnik, regarding the March 4, 2015 announcement that AbbVie, Inc. had agreed to acquire Pharmacyclics, Inc. ("Pharmacyclics"). Pharmacyclics was a biopharmaceutical company headquartered in California that traded on the NASDAQ under the ticker symbol PCYC.

42. On February 19, 2015, Windsor—who was not staffed on the deal team at Investment Bank 2 regarding the Pharmacyclics acquisition—obtained access to an Investment Bank 2 presentation concerning the nonpublic merger discussions between Pharmacyclics and three potential acquirors. The confidential document indicated that the three companies were actively engaged in due diligence and were working to provide an indication of interest in acquiring Pharmacyclics by March 3, 2015.

43. On or before March 4, 2015, Windsor and Taylor directly or indirectly tipped Trader A, who in turn tipped Feingold and Malnik, with material non-public information regarding the potential acquisition of Pharmacyclics.

44. On March 4, 2015, Trader A, on the basis of tips originating from Windsor, purchased 160,000 Pharmacyclics CFDs through two overseas trading accounts, and 500 Pharmacyclics call options through a U.S.-based trading account.

45. Also, on March 4, 2015, Feingold, on the basis of tips originating from Windsor, purchased 6,000 shares of Pharmacyclics through a brokerage account in the name of Bravo Business (the "Bravo Business Account"), and purchased an additional 5,000 shares through a brokerage account in the name of Upbeat Worldwide (the "Upbeat Worldwide Account").

10

Feingold also purchased an additional 3,500 shares of Pharmacyclics the same day through his personal brokerage account (the "Feingold Account").

46. Also on March 4, 2015, Malnik, on the basis of tips originating from Windsor, purchased 1,200 shares of Pharmacyclics through a brokerage account in the name of Kuray Investments (the "Kuray Investments Account"), and purchased an additional 5,700 shares through a brokerage account in the name of Mignon Group (the "Mignon Group Account").

47. On March 4, 2015, after the markets closed, Pharmacyclics and AbbVie announced that they had reached a merger agreement, whereby AbbVie would acquire all of the shares of Pharmacyclics for $261.25 per share. By the time the markets closed the following day, March 5, 2015, Pharmacyclics' share price had risen to $254.22, reflecting an increase of 10% from the prior day's closing price of $230.48.

48. Beginning on March 5, 2015, Trader A, Feingold, and Malnik all liquidated their positions in Pharmacyclics.

49. As a result of his trading on inside information, Feingold realized approximately $350,000 in illicit trading profits in Pharmacyclics.

50. As a result of his trading on inside information, Malnik realized approximately $160,000 in illicit trading profits in Pharmacyclics.

51. As a result of his trading on inside information, Trader A realized approximately $6,125,677 in illicit trading profits in Pharmacyclics.

**Omnicare**

52. Similarly, in May 2015, Feingold and Malnik traded timely and profitably in securities of Omnicare, Inc. ("Omnicare") based on Trader A's tips of material non-public information originating from Windsor and Taylor concerning the impending acquisition of

11

Omnicare. Omnicare was a U.S.-based healthcare company that traded on the NYSE under the ticker symbol OCR.

53. In or about February 2015, Omnicare formally engaged Investment Bank 2 as a financial advisor to the Board of Directors in connection with a review of strategic alternatives. Representatives of Investment Bank 2 then met with potential buyers over the following months.

54. On several occasions, beginning on or about March 25, 2015, Windsor accessed electronic files maintained by Investment Bank 2, which included a presentation to the Omnicare Board of Directors that included a discussion of the strategic rationale and potential synergies of each potential buyer. Windsor was not staffed on the deal team at Investment Bank 2 related to the potential sale of Omnicare. On April 13, 2015, Windsor accessed a draft slide deck prepared by Investment Bank 2 in connection with the firm's ongoing services as a financial adviser to Omnicare.

55. From April 18, 2015 through April 28, 2015, Omnicare negotiated and executed non-disclosure agreements with five parties, including CVS Health Corp. ("CVS"). Meanwhile, Windsor continued to access the electronic project folder for Omnicare's strategic review at Investment Bank 2.

56. On April 22, 2015, a news article reported that Omnicare was exploring a sale of the company and was working with financial advisers. The April 22, 2015 news article did not provide information about the potential sale price, and the company did not confirm that it was considering a potential sale.

57. On or before April 29, 2015, Windsor and Taylor tipped Trader A, who further tipped Feingold and Malnik with material non-public information regarding the potential acquisition of Omnicare.

12

58. On April 29, 2015, Malnik, on the basis of tips of inside information originating from Windsor, began building a position in Omnicare, purchasing 2,300 shares that day through the Kuray Investments Account.

59. On May 8, 2015, the Omnicare Board convened to discuss the strategic alternatives review process to date; Investment Bank 2 participated in the meeting and provided the Board with an update regarding the process. The Board also discussed the media coverage of the process, and Omnicare's outside counsel led a discussion in the importance of exercising care to maintain the confidentiality of information relating to the strategic alternatives review process.

60. On May 8, 2015, Trader A began purchasing securities of Omnicare on the basis of tips originating from Windsor, buying 10,000 Omnicare CFDs through an account based in Singapore. Trader A continued to build a position in Omnicare in the following days, buying a total of 65,000 Omnicare CFDs between May 11 and May 15, 2015.

61. On May 20, 2015, the Omnicare Board convened a meeting—with representatives of Investment Bank 2 in attendance—and voted to approve the proposed merger with CVS.

62. On May 20, 2015, on the basis of tips originating from Windsor, Trader A added 172,604 CFDs to his Omnicare position in his Singapore account. Trader A also purchased additional Omnicare equities and options through a US-based brokerage account.

63. Also on May 20, 2015, Malnik, through the Mignon Group Account, bought a total of 23,980 shares of Omnicare on the basis of tips originating from Windsor.

64. Also on May 20, 2015, Malnik and/or Feingold, through an account associated with the Adamas Healthcare Fund ("Adamas Account"), bought a total of 27,795 shares of Omnicare on the basis of tips originating from Windsor.

65. Also on May 20, 2015, Feingold, through the Upbeat Worldwide Account, bought a total of 32,795 shares of Omnicare on the basis of tips originating from Windsor.

66. On May 20, 2015, after the U.S. markets closed, at approximately 5:59 pm, the news media reported that CVS was in advanced talks to acquire Omnicare. The share price for Omnicare climbed immediately in the wake of the article, increasing 2.5 percent in after-hours trading. On May 21, 2015, before the U.S. markets opened, Omnicare and CVS issued a joint press release, announcing the execution of the merger agreement.

67. Beginning on May 21, 2015, Malnik liquidated his Omnicare position in the Kuray Investments Account, realizing profits of approximately $20,875. Malnik also liquidated his Omnicare position in the Mignon Group Account, realizing profits of approximately $53,574.

68. In total, Malnik realized profits totaling approximately $74,449 on trading on inside information about the Omnicare acquisition.

69. Beginning on May 21, 2015, Malnik and/or Feingold liquidated the Omnicare position in the Adamas Account, realizing profits of approximately $38,206.

70. On May 22, 2015, Feingold liquidated his Omnicare position in the Upbeat Worldwide Account, realizing profits of approximately $52,047.

71. In total, Trader A realized approximately $1.1 million in illicit profits from trading Omnicare.

72. While in possession of and based on material nonpublic information Windsor misappropriated from Investment Bank 2 and that Windsor and/or Taylor tipped to Trader A, Feingold and Malnik placed additional timely and profitable trades in the following U.S.-traded securities, as summarized in the chart below:

| Company/Ticker | Announcement/News | Profits |
|---|---|---|
| InterMune ("ITMN") | Before the market opened on August 25, 2014, ITMN announced that it had entered into an agreement to merge with Roche Holdings at a price of $74 per share. | In total, Malnik and Feingold realized $1,226,730 from trading in ITMN in August 2014, as follows:<br><br>Malnik (individual account): $123,814 profits |

14

| Company/Ticker | Announcement/News | Profits |
|---|---|---|
| | | Mignon Group, Ltd. (controlled by Malnik): $193,053 profits<br><br>Upbeat Worldwide (controlled by Feingold): $909,862 profits |
| Avanir Pharmaceuticals, Inc. ("AVNR") | On December 2, 2014, AVNR announced that it had agreed to be acquired by Otsuka Holdings Co., Ltd. for $17 per share pursuant to a tender offer. | In total, Malnik and Feingold realized $724,876 in profits from trading in advance of the 12/2/2014 announcement.<br><br>Malnik (individual account): $166,207 profits<br><br>Kuray Investments (controlled by Malnik): $90,671 profits<br><br>Ample Vantage (controlled by Malnik): $71,981 profits<br><br>Amiservice (controlled by Malnik): $110,040 profits<br><br>Mignon Group Ltd. (controlled by Malnik): $223,647 profits<br><br>Bravo Business (controlled by Feingold): $62,328 profits |
| Hyperion Therapeutics, Inc. ("HPTX") | On March 30, 2015, before the U.S. markets opened, HPTX announced that it agreed to be acquired by Horizon Pharma plc for $46.00 per share. | In total, Malnik and Feingold realized $1,019,427 in profits from trading in advance of the 3/30/2015 announcement.<br><br>Malnik (individual account): $57,565 profits<br><br>Kuray Investments (controlled by Malnik): $304,273 profits<br><br>Adamas (controlled by Malnik and/or Feingold): $126,346 profits<br><br>Amiservice (controlled by Malnik): $121,762 profits<br><br>Mignon Group, Ltd. (controlled by Malnik): $213,678 profits<br><br>Bravo Business (controlled by Feingold): $178,894 profits<br><br>Feingold (individual account): $21,573 profits |

| Company/Ticker | Announcement/News | Profits |
|---|---|---|
| | | Upbeat Worldwide (controlled by Feingold): $95,336 profits |
| Receptos, Inc. ("RCPT") | On the afternoon of April 1, 2015, a media outlet reported that RCPT was considering offers to be acquired. | In total, Malnik and Feingold generated $563,974 in profits trading in advance of the 4/1/15 news.<br><br>Malnik (individual account): $22,120 profits<br><br>Kuray Investments (controlled by Malnik): $34,347 profits<br><br>Ample Vantage (controlled by Malnik): $43,532 profits<br><br>Amiservice (controlled by Malnik): $94,983 profits<br><br>Adamas (controlled by Malnik and/or Feingold): $99,150 profits<br><br>Mignon Group, Ltd. (controlled by Malnik): $93,663 profits<br><br>Bravo Business (controlled by Feingold): $78,319 profits<br><br>Upbeat Worldwide (controlled by Feingold): $97,859 profits |
| Thoratec Corporation ("THOR") | On July 22, 2015, THOR announced that it had agreed to be acquired by St. Jude Medical Inc. | In total, Malnik and Feingold realized $527,028 in profits from trading in advance of the 7/22/2015 announcement.<br><br>Kuray Investments (controlled by Malnik): $73,095 profits<br><br>Adamas (controlled by Malnik and/or Feingold): $453,933 profits |

73.    Each of the above-referenced bids for Avanir Pharmaceuticals, Hyperion Therapeutics, and Pharmacyclics contemplated an acquisition through means of a tender offer.

74.    At the time Windsor and/or Taylor tipped Trader A, and Trader A further tipped Feingold and Malnik, regarding these tender offers, a substantial step or steps to commence each

16

of the offers—including (depending on the specifics of the tender offer) negotiations, board meetings, the arrangement of financing, the hiring of advisors, and/or proposals—had been taken.

75. All of Feingold and Malnik's trades on inside information in Pharmacyclics, Hyperion Therapeutics, Receptos, Omnicare, and Thoratec as part of the Taylor-Windsor Tipping Scheme were made, and all illicit profits were realized, within the five-year statute of limitations applicable to claims brought under the Exchange Act.

**FIRST CLAIM FOR RELIEF**
*Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder*

76. The Commission re-alleges and incorporates by reference Paragraphs 1 through 75 above as if they were fully set forth herein.

77. Feingold and Malnik traded securities while in possession, and on the basis, of material nonpublic information about the deals advised by Investment Bank 2 and provided by Trader A, including but not limited to Intermune, Avanir, Pharmacyclics, Hyperion, Omnicare, Receptos, and Thoratec. In each such instance, Feingold and Malnik knew or recklessly disregarded that the information provided was material and nonpublic. Feingold and Malnik also knew, recklessly disregarded, should have known, or consciously avoided knowing that such material nonpublic information had been conveyed to and/or obtained by Trader A in breach of a duty or obligation arising from a similar relationship of trust or confidence.

78. By engaging in the conduct described above, Feingold and Malnik, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, with scienter:

    (a) employed devices, schemes, or artifices to defraud;

    (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

(c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

79. By reason of the actions alleged herein, Feingold and Malnik violated and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF
*Violations of Section 14(e) of the Exchange Act and Rule 14e-3 Thereunder*

80. The Commission re-alleges and incorporates by reference Paragraphs 1 through 75 above as if they were fully set forth herein.

81. By engaging in the conduct described in above, Feingold and Malnik, prior to the public announcement of tender offers to acquire Avanir, Pharmacyclics, and Hyperion, and after a substantial step or steps to commence each of the tender offers had been taken, while in possession of material information relating to the tender offers, which information they knew or had reason to know was nonpublic and had been acquired directly or indirectly from the offering company, the issuer, or any officer, director, partner, or employee, or other person acting on behalf of the offering company or issuer, purchased or caused to be purchased or sold or caused to be sold the securities sought or to be sought by such tender offers.

82. By reason of the actions alleged herein, Feingold and Malnik violated and, unless restrained and enjoined, will continue to violate Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

### THIRD CLAIM FOR RELIEF
*Other Equitable Relief, Including Unjust Enrichment and Constructive Trust, Against Relief Defendants*

83. The Commission repeats and reincorporates by reference in the allegations in paragraphs 1 through 75 above as if set forth fully herein.

84. Section 21(d)(5) of the Exchange Act [15 U.S.C. §78u(d)(5)] states: "In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."

85. The Relief Defendants have received funds under circumstances dictating that, in equity and good conscience, they should not be allowed to retain such funds.

86. As a result, the Relief Defendants are liable for unjust enrichment and should be required to return their ill-gotten gains, in an amount to be determined by the Court.

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

I.

Finding that Defendants Feingold and Malnik each violated Sections 10(b) and 14(e) of the Exchange Act [15 U.S.C. §§ 78j(b), 78n(e)] and Rules 10b-5 and 14e-3 thereunder [17 C.F.R. §§ 240.10b-5, 240.14e-3];

II.

Permanently restraining and enjoining Defendants from violating Sections 10(b) and 14(e) of the Exchange Act [15 U.S.C. §§ 78j(b), 78(n)(e)] and Rules 10b-5 and 14e-3 thereunder [17 C.F.R. §§ 240.10b-5, 240.14e-3];

III.

Ordering each Defendant and Relief Defendant to disgorge, with prejudgment interest, all ill-gotten gains or unjust enrichment derived from all actions alleged herein that occurred during the applicable five-year statutes of limitations;

IV.

Ordering Defendants to pay civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1];

V.

Retaining jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

VI.

Granting such other and further relief as this Court may determine to be just and appropriate.

Dated: March 3, 2020

By: /s/ Assunta Vivolo

Joseph G. Sansone
Assunta Vivolo
Caitlyn Campbell
Michael D. Foster
Rua M. Kelly
U.S. Securities and Exchange Commission
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(617)-573-8941
kellyru@sec.gov